UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


Tonya France,                              :      Case No. 1:11-CV-184
                                           :
         Plaintiff,                        :
                                           :
vs.                                        :
                                           :
Michael J. Astrue, Commissioner of        :
Social Security,                           :
                                           :
         Defendant.                        :


**ORDER**

Before the Court are Plaintiff's objections to the Magistrate Judge's Report

and Recommendations.  (Doc. 13) In her report (Doc. 11), the Magistrate Judge

recommends that this Court affirm the final decision of the Commissioner denying

Plaintiff's application for disability benefits.  As explained below, the Court agrees

with the Magistrate Judge's recommendations.

**FACTUAL BACKGROUND**

In 2003, Tonya France initially applied for disability benefits, alleging an

onset date of July 14, 2003.  After her application was denied, she requested an

evidentiary hearing which was held on November 29, 2006.  (TR 973-1006)  In a

May 7, 2007 decision, the ALJ denied France's claim for benefits. France

appealed the decision to the Appeals Council, which remanded the matter with

instructions to develop additional information regarding France's past work, and to

obtain evidence from a medical expert on the nature and severity of France's

physical impairments. The ALJ conducted the remand hearing on May 12, 2009.

(TR 1007-1083) In a June 22, 2009 written decision, the ALJ again denied

France's claim. (TR 25-42)

The ALJ found that France has severe impairments of obesity; post total

right hip arthroplasty in 1998; degenerative joint disease of the left knee; back

impairment; carpal tunnel syndrome; right knee problem; depression, personality

disorder; anxiety; and bulimia. Based on the testimony of Dr. Hulon, the medical

expert present at the second evidentiary hearing, the ALJ concluded that none of

France's impairments met or exceeded the Listings, specifically Listings 1.04 and

1.02A regarding joint impairments, and Listings 12.04, 12.06, and 12.08 regarding

mental impairments. Dr. Hulon testified that France walked with one cane, was

able to perform daily living activities, and that EMG studies revealed no

neurological deficits. He noted the possibility of some trauma sustained to a nerve

passing through the gluteus during her 1998 hip surgery. But she was able to

return to work after that surgery, and Dr. Hulon opined that the condition is

typically more of an annoyance and normally not something that would worsen over time. With respect to France's carpal tunnel syndrome, Dr. Hulon noted that after France had lost weight and complied with splinting recommendations, her repeat EMG testing showed improvement. He believed that France was somewhat limited in the use of her fingers, hands and wrists for fine movement, but that her impairments did not fall within the Listing's criteria.

The ALJ then formulated France's residual functional capacity to perform some sedentary work:

> She can lift up to 10 pounds; stand and/or walk for at
> least 2 hours in an 8-hour work day and no more than 4
> hours; and sit about 6 hours in an 8-hour work day. She
> is limited in her ability to push and/or pull with the lower
> extremities and can occasionally climb ramps/stairs and
> stoop. She should never climb ladders/ropes/scaffolds,
> kneel, crouch, or crawl. She is limited to frequent
> fingering (fine manipulation) and feeling with the right
> hand. She should avoid concentrated exposure to
> vibration, and to hazards such as machinery/heights. She
> should avoid highly complex work or work with strict
> production quotas/standards and should only do work
> that involves superficial contact with others and which
> involves no interaction with the general public.

(TR 30) In reaching this determination, the ALJ cited France's testimony from the prior hearing and summarized her 2009 testimony. France testified that she had been wearing splints at night for the past year and a half, and that she did not want

carpal tunnel surgery.  She complained of numbness and tingling in both hands, pain in her shoulder and both legs, and back pain.  She said she had fallen sometime in the past year, and was using a cane; she attributed her fall to left leg numbness, and reported her leg grew numb if she sat or stood for too long.  She reported that her knee grinds, and that one doctor had recommended that she elevate her legs above the level of her heart.  She said she had "good use" of her hands only about 20% of the day, and that she could not lift five pounds.  France also reported seeing a therapist.  She took her son to the park, and had a stationary bike that she used twice a week.  She had decided not to attend nursing school because she would be unable to focus on full time work.

The ALJ also reviewed France's medical history and the evidence regarding her impairments.  France had a total left knee replacement in May 2007, and that the post-surgical report showed good range of motion.  The records also documented longstanding history of right knee pain, and she had a right knee replacement in June 2008.  By September 2008, she reported to her primary care physician that she was walking 1-2 miles on most days for the past two weeks, and was beginning to ride a bicycle.  (TR 800)  She did complain to her knee surgeon in June 2008 of some right hip discomfort (she had a total hip replacement ten years earlier), but studies and scans were negative for any disease or malfunction.

Her March 2008 EMG studies indicated "mild" right compression neuropathy consistent with carpal tunnel syndrome, an improvement from the 2006 study. She continued treating with a chiropractor, Dr. Elwert, and attended physical therapy in early 2008. She reported at that time that her medication for back pain was not working, but Dr. Martinez did not change her medications. Dr. Martinez also noted in February 2008 that France was ambulating "okay." (TR 678) Her February 2008 MRI showed mild deformities at T11-12, degenerative disc disease with some disc protrusion at L4-5, and arthropathy at L5-S1 with mild narrowing of the right L5 foramen. (TR 679) On March 28, shortly after her right knee release surgery (that preceded the right replacement surgery in June), she reported to Dr. Martinez that her pain level was 10 but he did not change her medications. (TR 672) She reported to her physical therapist on April 4 that her pain level was 2 (out of 10), and she tolerated the treatment well. (TR 671) In September 2008, France reported to Martinez a moderate (level 4-5) pain level, and that her back was stiff. Dr. Martinez noted her antalgic gait but negative straight leg raising. (TR 936) She reported that her pain was averaging level 7.5 in November, and she was started on a trial of methadone. (TR 933-934) She felt the methadone was helping, but she discontinued medications when she became pregnant in February 2009.

Dr. Martinez completed a physical residual functional capacity assessment in November 2008, noting his diagnoses of T11-12 disc herniation, lumbar radiculopathy, degenerative disc disease and arthropathy, L5-S1 disc protrusion, hip osteoarthritis, and right carpal tunnel syndrome. (TR 940-944) He opined that France was incapable of working due to low back and leg pain, leg numbness, tingling, and weakness. She could walk less than one block; stand, walk or sit for two hours in a day, and needed to elevate her legs above her heart 50% of the day. She could not lift, crouch, or climb ladders, and was limited to only occasional neck movement, twisting or stair climbing. She could not reach with her right arm, or perform any fine manipulations with her right hand. He also stated that her current conditions and pain status produced psychological limitations, but did not further explain what those limitations may be. (TR 944)

The ALJ then summarized Dr. Hulon's testimony. He believed that France's primary problem was congenital hip dysplasia and dislocation, noting she had several surgeries as a child to correct the problem. Dr. Hulon noted that France's weight had worsened her conditions and complaints. Her weight complicated her right hip replacement surgery, and accelerated the progress of degeneration of her knees. France was told in 2006 that her left hip should be replaced, but due to her weight the surgery would be very difficult to perform properly. He also noted

some deterioration in her left hip, and some lumbar and thoracic changes that he believed were made worse by her obesity. Dr. Hulon agreed that France had bilateral carpal tunnel syndrome, but he observed that this condition improved when France used splints, took medication, and lost weight. This impairment would not allow regular fine finger movement such as typing, or exposure to vibrations. He also agreed that France had pain and osteoarthritis which would get worse if she continued to gain weight. He believed that France did not meet Listing 1.04 or 1.02A, and that she could do some range of sedentary work. Dr. Hulon stated that if Dr. Martinez was correct, France would have been unable to attend the ALJ hearing and would be essentially bedridden. He could not understand Martinez's statement that France must elevate her feet above her heart four hours a day, as that position would cause additional stress and pain in her back. Dr. Hulon with the October 2008 assessment of Dr. Torello, a state reviewing physician (see TR 789-796), who concluded that she could perform less than a full range of sedentary work with some exertional limitations.

The ALJ found that Dr. Hulon's testimony was well supported by the record, and accurately assessed France's physical functional status. With regard to Dr. Martinez, the ALJ accepted his diagnoses but not his opinion on her restrictions, which were inconsistent with France's own reports of her activities and her reports

to other physicians.  There was no objective medical evidence that France had lumbar radiculopathy, and France reported significant walking and bicycle riding in September and October 2008, just prior to Martinez's RFC.  While she stopped all of her medications when she became pregnant, she reported to Dr. Gonzalez in March 2009 that she was not in distress and denied any problems.  (TR 949)  The ALJ found that France's own presentation of her functionality was "not particularly credible."  (TR 39)  While France was told that she could stand and sit at will during the almost two-hour hearing, the ALJ observed that she sat the entire time.  While she claimed to be very limited in walking, she reported walking 1-2 miles a day in 2008 after her knee surgery.  She also reported that she went to her son's soccer games and karate lessons.  The ALJ found that her subjective descriptions of her limitations lacked credibility to the extent that she claimed to be completely unable to work.

After finding France unable to perform her past work, the ALJ concluded that there are jobs available that she could perform.  The vocational expert testified at the hearing that, given the ALJ's residual functional assessment, France could perform available jobs including production worker assembler and inspector, and provided corresponding DOT codes for those positions.  The VE confirmed that his testimony was consistent with the DOT.  The ALJ accepted the testimony and

concluded that France is not disabled.

The Appeals Council denied review of the ALJ's decision, and France filed her complaint in this action. After review of the record, the Magistrate Judge recommended that the ALJ's decision be affirmed. (Doc. 11) France raises four objections to that recommendation, each of which is addressed below.

## DISCUSSION

Standard of Review

Under 42 U.S.C. §405(g), this Court reviews the Commissioner's decision by determining whether the record as a whole contains substantial evidence to support that decision. "Substantial evidence means more than a mere scintilla of evidence, such as evidence a reasonable mind might accept as adequate to support a conclusion. ... The evidence must do more than create a suspicion of the existence of the fact to be established. It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." LeMaster v. Secretary of Health and Human Serv., 802 F.2d 839, 840 (6th Cir. 1986) (internal citation omitted).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. ... Therefore, if substantial evidence supports the ALJ's decision, this

Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009)(internal citations omitted).  If the ALJ's decision is supported by substantial evidence, the Court must affirm that decision even if it would have arrived at a different conclusion based on the same evidence.  Elkins v. Secretary of Health and Human Serv., 658 F.2d 437, 438 (6th Cir. 1981).     The district court reviews de novo the Magistrate Judge's recommendations regarding Social Security benefits claims.  Ivy v. Secretary of Health & Human Serv., 976 F.2d 288, 289-90 (6th Cir. 1992).

France's Objections

1.     France argues that the ALJ's hypothetical question to the vocational expert was incomplete.  She contends that the objective evidence demonstrates that she is capable of only occasional bilateral use of her hands.  And she argues that the jobs identified by the VE are inconsistent with that restriction.

The ALJ's residual function capacity findings include a restriction on fine manipulation and feeling with her right hand, and no exposure to vibration.  The ALJ relied on France's testimony that she was no longer being treated for carpal tunnel syndrome, and that she had been wearing splints at night for the past 18 months.  France testified that she had good use of her hands only about 20% of the

time, and that she could lift less than 5 pounds.  The ALJ found her subjective descriptions were not credible to the extent they were inconsistent with the ALJ's RFC assessment.  The ALJ also cited France's upper EMG study on March 24, 2008, documenting only mild right medial compression neuropathy, with no evidence of any nerve impingement or cervical radiculopathy.  (TR 633-634) This was an improvement over a previous 2006 EMG study, showing mild to moderate CTS in her right hand.

The ALJ's determinations of credibility are given great weight, and are reviewed for substantial evidence.  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003).  The Court concludes that substantial medical evidence supports the ALJ's determination that France has more than "occasional" use of her hands, as France claimed.  The ALJ rejected Dr. Martinez's November 2008 assessment that France's right hand is almost useless, as he rated her ability to grasp, turn or twist objects, and fine finger manipulation at zero percent.  (TR 944) Dr. Elwert, France's chiropractor, completed an RFC assessment in 2006 (see TR 406-410), two years before her 2008 EMG study that showed improvement in her CTS.   Dr. Elwert rated both her right and left hand use at 25%, while Dr. Martinez rated her left hand at 80% or better.

The Social Security regulations provide that a treating physician's opinion is

entitled to controlling weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2). The ALJ must determine how much weight should be given to a treating source's opinion on the basis of several factors, including the frequency of exams, the treating physician's specialty, and the nature and length of the treating relationship. And the ALJ must provide "good reasons" for the weight she accords to any treating physician's assessment, reasons that are "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Blakley v. Comm'r, 581 F.3d at 406-407, quoting Soc. Sec. Rul. 96-2p. The regulations further instruct that, with regard to any medical opinion, "... the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. §404.1527(d)(4). Moreover, the ALJ need not accept a medical opinion that a claimant is "disabled" and unemployable, as that determination rests with the Commissioner under 20 C.F.R. §404.1527(e)(1).

The Court concludes that the ALJ satisfied these standards, explaining at some length the reasons she discounted Dr. Martinez's RFC assessment. The ALJ

cited the objective medical evidence in the record that supported her findings, and noted her reliance on Dr. Hulon's opinions.

France also objects to the ALJ's hypothetical to the VE, because the jobs identified by the VE require "manual dexterity" which she contends she lacks. She cites descriptions of these positions contained in an online publication called O*NET.[1]  As the Commissioner noted in response to France's statement of errors, the O*NET is not the Dictionary of Occupational Titles (DOT) published by the U.S. Department of Labor. France has not identified any direct conflict between the VE's testimony and the DOT. Soc. Sec. Ruling 00-4p requires the ALJ to ask a testifying vocational expert about any potential conflict between the expert's opinion and the DOT. The ALJ satisfied that requirement in this case. But there is no requirement that the ALJ rely on DOT classifications, or perform any independent investigation into the bases of a VE's testimony about the DOT or about available jobs in the economy.

In Martin v. Comm'r of Soc. Sec., 170 Fed. Appx. 369 (6th Cir., March 1, 2006)(unpublished), cited by the Magistrate Judge, the ALJ had asked the VE if there was a conflict between the DOT's description and the VE's testimony

_____

[1] See www.occupationalinfo.org/onet, cited in France's objections, and last accessed August 17, 2012.

-13-

identifying jobs that the plaintiff could perform; the VE responded there was no conflict. The plaintiff did not identify any conflict or discrepancy at the administrative hearing, but did raised one in the case before the district court. The Sixth Circuit noted that "nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct. Furthermore, even if there is a conflict between the expert's testimony and the DOT, 'neither the DOT or [the expert's testimony] automatically trumps when there is a conflict.'" Id. at *13. Since the ALJ had specifically asked the VE to confirm the lack of a conflict, the Sixth Circuit held that the ALJ had complied with the regulations, and affirmed the denial of benefits. See also, Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 605-606 (6th Cir. 2009), citing Martin and rejecting the claimant's argument that the ALJ should have further interrogated the VE after he testified that there were no conflicts between his testimony and the DOT.

Here, the ALJ specifically asked the VE if his testimony was consistent with the DOT, and he confirmed that it was. (TR 1080) France did not dispute the VE's qualifications, and she had the opportunity to cross-examine him but did not suggest any discrepancy with the DOT. These facts are sufficient to satisfy the Social Security regulations, and demonstrate that the ALJ did not err in

formulating the hypothetical to the VE or by accepting the VE's testimony with regard to available jobs. For these reasons, France's first objection is overruled.

2.     France next objects to the Magistrate Judge's conclusion that her impairments do not meet or exceed Listing 1.03, one of the listed musculoskeletal system disorders. Listing 1.03 covers: "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." (20 C.F.R. Part 404, Subpart P, Appendix 1.) The definition of "inability to ambulate effectively" contained in 1.00B2(1) and (2) requires a showing of

"... an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. ...

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability

-15-

to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Dr. Hulon testified that France did not meet Listing 1.02B or 1.04, listings that cover major joint dysfunction and spinal disorders causing nerve root compromise. The ALJ cited his testimony to reach the same conclusion. France does not object to this conclusion, but argues that Dr. Hulon and the ALJ did not address Listing 1.03. She contends there is abundant evidence in the record that she is unable to ambulate effectively. The Court notes that many of her record citations (see Doc. 13 at pp. 8-9) noting (among other things) antalgic gain, leg weakness, difficulty standing up, ankle swelling, pain during walking, and limited range of motion, pre-date her knee surgeries in 2007 and 2008. After her surgery in 2008, as the ALJ correctly noted, she reported that she had started walking one to two miles several times a week, and had also started bicycling because it did not hurt her knees. While the record shows that she has osteoarthritis, her post-surgery records do not support her contention that she cannot ambulate effectively.

Moreover, as the Magistrate Judge concluded, there is no evidence that any

treating physician or therapist prescribed her an assistive device of the type

mentioned in the Listing definition (e.g., a walker, two crutches or two canes).

France has not shown that she is unable to walk a block, to use public

transportation, to shop, or to climb a few steps at a reasonable pace.  In fact she

stated that she could attend her son's soccer games and that she was able to go

shopping and take care of her daily activities.  France relies on Dr. Martinez's

assessment that her symptoms are so severe that she cannot walk for even one

block without severe pain.  As the ALJ observed, Dr. Martinez's functional

assessment was performed several weeks after France reported that she began

walking and bicycle riding on a regular basis.  France has not explained this rather

glaring disparity.

The Magistrate Judge recognized that France had knee surgery on both

knees, but concluded that she had not established an inability to ambulate

effectively within the meaning of the Listing's definition.  The Court agrees with

this conclusion because it is supported by substantial evidence in the record.

3.      In her third objection, France contends that the ALJ failed to give the

opinions of her treating physicians, Dr. Elwert and Dr. Martinez, proper deference

if not controlling weight.  She argues that both physicians treated her for a

significant period of time, and that their treatment and evaluation of her

impairments were entitled to more weight than Dr. Hulon's opinions, who never treated nor examined France. The vocational expert testified that if the ALJ accepted either Dr. Martinez or Dr. Elwert's functional assessment, France would be unemployable. (TR 1079) The Magistrate Judge found that the ALJ had thoroughly analyzed the record evidence in rejecting Dr. Martinez's assessment, and in concluding that Dr. Hulon accurately assessed France's functional limitations. This Court agrees with that conclusion.

As discussed above, the Commissioner is not required to give controlling weight to the opinions of a treating physician. The ALJ observed that Dr. Martinez' November 2008 physical functional assessment described France as almost immobile or "bedridden." (TR 37) Martinez opined that France was in constant pain severe enough to interfere with simple tasks, and was "incapable" of even low-stress jobs. He believed she could walk for less than one block, sit for only fifteen minutes, and stand for only five to fifteen minutes; that she would need to stand and walk every ten to fifteen minutes, and would need frequent unscheduled breaks during the day; that she should elevate her legs above her heart for at least half of a working day; and that she should "never" lift any weight and never look down, twist, or crouch. He also opined that her right hand was essentially useless. (TR 940-944) The ALJ cited the objective evidence that she

found contradicted these extreme limitations, and explained why she did not give Dr. Martinez's opinions much weight in her analysis.

In her objections, France notes that Dr. Martinez made a number of diagnoses of her conditions, including T11-12 herniated disc; lumbar radiculopathy, degenerative disc disease, and osteoarthritis; and believed that her prognosis is "poor." He noted a number of clinical findings regarding her legs, back and hip, findings she argues support his functional assessment. But as the Magistrate Judge observed, providing several diagnoses, or cataloguing a series of clinical symptoms, does not establish the extent or severity of any functional limitations that may result from any diagnosis or symptom. The Magistrate Judge cited Young v. Secretary of Health & Human Servs., 925 F.2d 146, 151 (6th Cir. 1990), where the claimant alleged that she suffered from disabling pain. In rejecting her claim, the Sixth Circuit noted that a claimant must not only provide objective evidence of an underlying medical condition that causes or could cause pain: she must also provide objective evidence that would confirm the severity of the pain allegedly arising from that condition.

Here, as the ALJ found, Dr. Martinez's functional limitations were not supported by objective evidence that would confirm the severity of his opinions. He opined that France could not walk more than one block, yet she reported she

was walking one to two miles just weeks before he completed his assessment. He opined that France's right hand was essentially useless, when all of the objective evidence from the EMG studies did not support such an extreme limitation, and France described her regular use of wrist splints at night to lessen the effects of her carpal tunnel syndrome. He stated that France should elevate her legs above her heart at least four hours a day, which Dr. Hulon said would be very difficult given her back condition. Dr. Hulon recognized that straightening her leg frequently would be helpful, but not for a four-hour period above her heart. (TR 1053-54) Dr. Martinez also diagnosed lumbar radiculopathy, but there is no clinical evidence supporting that diagnosis. The ALJ noted that France's own descriptions of her daily activities, such as taking her son to soccer games or to the park, were inconsistent with Dr. Martinez's opinions.

France also objects to the ALJ's failure to accept Dr. Elwert's functional assessment. Dr. Elwert is a chiropractor with whom France had been treating for several years. His opinion of France's functional capacity, dated August 17, 2006 (TR 406-410), is similar to that of Dr. Martinez in many respects, although he believed that she could lift less than 10 pounds frequently, and he rated both of her hands at 25% of use during an 8-hour day. The ALJ did not directly discuss Dr. Elwert's assessment in her most recent opinion. In the earlier opinion, the ALJ

rejected his assessment and gave it no weight, because his opinion was inconsistent with the record as a whole, and because a chiropractor is not considered to be an "acceptable medical source," citing 20 C.F.R. §404.1513(d).  (TR 478)  The Magistrate Judge cited that regulation to conclude that the ALJ was under no obligation to accept Elwert's opinion, or to give it any heightened deference.

The Court agrees that the ALJ did not err in failing to address Elwert's assessment or accord it any particular weight.  The regulations define "acceptable medical sources" as licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists.  See 20 C.F.R. §404.1513(a).  Subsection (d) states that the Commissioner "may" use evidence from other sources, including chiropractors, to show the severity of a claimant's impairments.  This permissive language imposes no duty or burden on the Commissioner to consider, much less accord controlling weight, to the functional assessment of a treating chiropractor. Moreover, the ALJ addressed at length the clinical evidence in the record upon which she rejected Dr. Martinez's assessments, and the same evidence and analysis would apply to Dr. Elwert's functional assessment.

For these reasons, the Court agrees with the Magistrate Judge's conclusion that the ALJ did not err in failing to accord controlling weight to the opinions of Dr. Martinez or Dr. Elwert.

4. In her fourth objection, France contends that the ALJ erred when she did not consider whether France could sustain regular work, and failed to take account of Dr. Hulon's statement that she would have "frequent interruptions during the work day" due to pain. France argues that the ALJ prematurely terminated her counsel's cross examination, and did not permit further questioning of Dr. Hulon about the number or duration of breaks he believed she might need. She contends that the ALJ did not properly consider whether or not she could sustain regular work. France again relies on the opinions of Drs. Martinez and Elwert, who both thought that she would miss more than two days of work per month. She notes that the vocational expert testified that missing that much work would render her unemployable. (TR 1081)

As more fully discussed above, the ALJ did not err in rejecting the opinions of Drs. Martinez and Elwert, and France does not point to any additional evidence that might support their opinions with regard to how many days of work she might miss per month. The reasons the ALJ rejected Dr. Martinez's extreme limitations with respect to her ability to move and to use her hands also support a rejection of his opinion with respect to potential days missed from work.

With regard to Dr. Hulon, France argues that the ALJ improperly terminated her counsel's questioning, denying her the opportunity to meaningfully develop

further testimony.  While France does not raise a specific due process deprivation

argument, she claims that the ALJ erred in refusing her further cross-examination.

The Sixth Circuit has held that a claimant's Social Security hearing must be "full

and fair."  Flatford v. Chater, 93 F.3d 1296, 1305 (6th Cir. 1996), quoting

Richardson v. Perales, 402 U.S. 389, 401-02 (1979).  The record shows that the

ALJ questioned Dr. Hulon at some length about his review of the record and his

opinions.  France's counsel began her cross-examination by asking a series of

questions about his licensure, his address, his medical training, and the

professional publications he reads.  (TR 1055-1059)  The ALJ then warned

France's counsel that

> [y]ou have ten more minutes ... here's the problem, okay?
> ... it seems like the attorneys are now starting to go into a
> lot of cross-examination and, you know, you want to voir
> dire him, but claimants are waiting two years for a
> hearing, okay?  And if we start going to supplemental
> hearings and going two or three hours to hearings, ... then
> claimants are going to start waiting four years for a
> hearing. ...  I mean, you can use your time.  But I'm
> going to start limiting [cross-examination]... .

(TR 1059-1060)  France's counsel then objected because she asserted that Dr.

Hulon was not qualified to offer an opinion.  (France has not renewed that

objection in these proceedings.)  After some additional voir dire questions, counsel

began asking Hulon about France's spinal MRI results, repeatedly suggesting that

-23-

they would objectively establish a source of pain.  Dr. Hulon disagreed and explained his reasons.  (TR 1064-1069)  The ALJ then warned counsel that she had two more minutes for cross-examination, and counsel asked some additional questions about France's reported pain.  She then asked Dr. Hulon if he would expect France to experience "frequent interruptions during the work day due to her pain?"  (TR 1072)  Hulon responded that the answer would depend upon the individual, calling it an open-ended question but stating "that could happen." Counsel again asked if he would expect it to happen, and Hulon answered yes. (TR 1073)  At that point, the ALJ terminated the cross-examination, over France's objection, and began the testimony of the vocational expert.

In her written decision, the ALJ noted that France's counsel had approximately 30 to 45 minutes to question Dr. Hulon, which she chose to spend primarily challenging his qualifications based on incorrect information found on the internet.  She also noted that the 2008 hearing was held after a remand from the Appeals Council for additional evidence on limited issues, and after a record had already been developed.  The ALJ stated that in every case, she must balance the public interest in timely hearings with a claimant's need to develop evidence or testimony.  She cited the tremendous backlog of disability claimants waiting for hearings around the country and in the Cincinnati office.  The ALJ concluded:

"Given the nature of [counsel's] objection to Dr. Hulon testifying as a medical expert, her overall cross-examination of this expert witness, the nature and content of that cross-examination, her request that Dr. Hulon be stricken as a medical expert is denied, and her request for a supplemental hearing is likewise denied." (TR 40)

The Court rejects France's contention that the ALJ erred in refusing further time to cross-examine Dr. Hulon. The Court notes that Dr. Hulon was appointed almost a month prior to the hearing (TR 884), and that he is Board Certified in Occupational Medicine, among other accomplishments. (TR 892) He had already testified that he agreed with Dr. Torello's October 2008 RFC, and explained that if Dr. Martinez's assessment were to be believed, France could not have attended the hearing. The ALJ warned counsel in advance that hearing time was limited. France's objections here presume that her counsel would have continued questioning Dr. Hulon on the subject of breaks, and that Dr. Hulon would have eventually agreed with Dr. Martinez, a presumption that is unsupported by the objective evidence and the balance of Dr. Hulon's testimony. In Young v. Apfel, 40 Fed. Appx. 157, 2002 U.S. App. LEXIS 13842 (6th Cir., July 8, 2002) (unpublished), the court rejected a claimant's argument that the ALJ improperly terminated his attorney's cross-examination of a vocational expert. The attorney

had cross-examined the expert on an issue involving piece work or minimum production requirements that the jobs identified by the VE required. After an additional question in this area, the ALJ told counsel "That's the last question I'm going to take from you on quotas, production, piece rate or anything else. Do you have any other questions?" The attorney responded "outside of the (INAUDIBLE) ... no." The questioning ended at that point. The Sixth Circuit held that the claimant's assertion that his attorney was unfairly cut off and was about to elicit helpful testimony from the expert was mere speculation. And the record did not support a conclusion that the ALJ had "abandoned his role as an impartial decisionmaker or failed in his duty to aid the claimant in a full development of the record." Id. at **18-19, quoting Flatford, 93 F.3d at 1307.

This Court reaches the same conclusion here. The ALJ explained the reasons that she terminated the cross-examination, and this Court finds that she did not err in doing so, and that France's due process rights were not violated. France's fourth objection is overruled.

## CONCLUSION

For all of the foregoing reasons, the Court adopts the Report and Recommendation of the Magistrate Judge. (Doc. 11) The decision of the Commissioner is supported by substantial evidence in the record, and is affirmed in

all respects.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: August 28, 2012          s/Sandra S. Beckwith
                                Sandra S. Beckwith
                                Senior United States District Judge